UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANK SUMMERS and JOSELYN SUMMERS,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 09-4920 (JEI/AMD)<br><br>**OPINION PURSUANT TO FED. R. CIV. P. 52(a)(1)** |

**APPEARANCES:**

PARKER McCAY P.A.
By: Gary F. Piserchia, Esq.
9000 Midlantic Drive, Suite 300
P.O. Box 5054
Mount Laurel, New Jersey 08054
        Counsel for Plaintiffs

PAUL J. FISHMAN, UNITED STATES ATTORNEY
By: Colette R. Buchanan, Esq.
970 Broad Street, Suite 700
Newark, New Jersey 07102
        Counsel for Defendant

**IRENAS**, Senior District Judge:

    This is a personal injury negligence suit brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq.  Plaintiff Frank Summers fell from a ladder permanently affixed to the side of the Doughboy Gymnasium building located at the Fort Dix, New Jersey military base.  The Complaint contains three counts: negligence, premises liability, and Plaintiff Joselyn Summers' loss of consortium claim.

    A bench trial was held on July 30 - August 2; August 6; and

August 15, 2012. The Court now issues this Opinion in accordance with Federal Rule of Civil Procedure 52(a)(1).[1] Section I contains stipulated facts (subsection A) and facts found by the Court (subsection B). Section II contains conclusions of law. For the reasons stated herein, the Court concludes that Defendant was not negligent, and therefore will enter judgment in its favor.

### I.

#### A. Stipulated facts[2]

1. Frank Summers was born on November 2, 1957.

2. The Doughboy Gymnasium and the ladder affixed thereto were owned by the United States Department of the Army.[3]

3. Mr. Summers was legally on the premises on January 2, 2008 and used the subject ladder to access the roof of Doughboy Gymnasium.

4. On January 2, 2008, Mr. Summers fell off the subject

---

[1] "In an action tried on the facts without a jury . . . the court must find the facts specifically and state its conclusions of law separately. The findings may . . . appear in an opinion or memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1).

[2] All stipulated facts are taken directly from the Joint Final Pretrial Order, p. 3.

[3] Defense counsel has advised the Court that the Department of the Army is no longer the owner of the building (and the ladder). However, the parties agree that the Army was the owner at all times relevant to this suit.

ladder.

 5. On January 2, 2008, Mr. Summers was transported from Fort Dix to Virtua Memorial Hospital, Mount Holly, New Jersey for treatment.

 6. Plaintiff Joselyn Summers is Frank Summers' wife, and has been since before January 2, 2008.

### B. Findings of Fact

 1. During the relevant time period, Mr. Summers was employed as a roofer by Patriot Roofing.

 2. Patriot was the subcontractor for Puente Construction Enterprises Incorporated which contracted with the Army to repair the roof of the Doughboy Gymnasium.

 3. On the morning of January 2, 2008, Mr. Summers and two other Patriot employees arrived at the gymnasium to begin work for the day.

 4. A roof access ladder made of steel was permanently affixed to the brick wall of the gymnasium. The steel rungs were three-quarters of an inch thick; the steel side rails were three-eighths of an inch thick.

 5. The ladder was fastened to the wall by four sets of two steel bolts on either side of the ladder's side rails.

 6. The bottom set of bolts were completely detached

from the wall[4] and the ladder was permanently bent sideways (in the same plane as the wall, i.e., parallel to the wall) approximately seven to eight inches.[5]

7. The other three sets of bolts-- at the middle of the ladder and at the top of the ladder-- were completely intact and engaged in the wall.

8. Mr. Summers used the ladder to access the roof more than once during the previous work day.

9. On the morning of January 2, 2008, while descending the ladder, Mr. Summers fell off the ladder onto the ground. Describing how the fall occurred, Mr. Summers testified, "as I came back down the ladder . . . the ladder jarred away from the building and twisted and threw me." (Trial Transcript, July 31, 2012, p. 95)

---

[4] Both Plaintiffs' expert, Mr. Widas, and Defendant's expert, Mr. Krafchick, testified that at least one of the bottom bolts was, at times, partially engaged in the wall. (See Trial Transcript, August 1, 2012, p. 28-29, 44, 122-23). The Court rejects that testimony as inconsistent with the photographs of the bolts and wall (See Exs. P-36; P-39; P-40) and both experts' testimony that the ladder was permanently bent laterally. (Trial Transcript, August 1, 2012, p. 63, 134)

[5] More than one witness testified that the ladder looked as if, at some earlier time, a vehicle forcefully struck the ladder from the side.
Several of the photographs introduced into evidence seem to show the ladder bending out and away from the wall. (See, e.g., Ex. P-16)  However, all of the witnesses who observed the ladder in-person testified that the ladder was bent sideways, left to right, and that the photographs merely create an optical illusion of the ladder bending away from the wall.

    On cross-examination he explained again:

> A: . . . What made me fall was the ladder jarred from the building, bounced.  And then when it bounced, I tried to grab the rung, I had no control. . . .
>
> Q: So your testimony is that the ladder swung away from the building?
>
> A: Not swung, jarred.
>
> Q: Jarred away from the building?
>
> A: Jarred enough to startle me not to know what to do . . .

(Trial Transcript, July 31, 2012, p. 116)

    10.  On the day of the fall, Mr. Summers measured 5 feet, 10 inches tall, and weighed approximately 200 pounds while he was wearing his work boots and winter clothes.

    11.  When Mr. Summers fell, his feet were moving from the second rung from the bottom of the ladder to the first rung; and his head was just below the safety cage that surrounded the top portion of the ladder.  His feet were approximately two and a half to three feet above the ground when he fell.

    12.  On January 2, 2008, the ladder was completely stable (i.e., it did not move) along the Y axis[6] and the Z axis when Mr. Summers was descending the ladder.

---

[6] Defendant's expert, Mr. Krafchick, created a useful demonstrative exhibit, Exhibit D-12-C, which is an enlarged picture of the ladder, with an x, y, and z axis superimposed over the picture.  The axes to which the Court refers in this opinion are the axes identified in Exhibit D-12-C.

13. With regard to the ladder's movement along the x axis, both Plaintiffs' and Defendant's experts testified that their subsequent testing of the ladder revealed some lateral deflection (i.e., movement) of the ladder. However, their testimony as to the extent of the deflection radically differs.

Mr. Widas, Plaintiffs' forensic engineer, testified that he was able to grab the ladder's bottom rung with his hand and move it approximately "a foot" (i.e., 12 inches) side to side. (Trial Transcript, August 1, 2012, p. 28-29)

On the other hand, Mr. Krafchick, Defendant's forensic engineer, testified that such deflection was "impossible." (Trial Transcript, August 1, 2012, p. 134) He tested the ladder and measured the greatest lateral deflection to be three-sixteenths of an inch; a deflection he described as "pretty negligible." (Trial Transcript, August 1, 2012, p. 121) Mr. Krafchick explained that the other three sets of engaged bolts and the ladder's steel side rails prevented the ladder from deflecting any further than three-sixteenths of an inch.

Faced with this drastic inconsistency between the experts' testimony with regard to this key fact, the Court allowed extensive rebuttal testimony from Mr. Widas, and then further testimony from Mr. Krafchick.[7] Both experts performed additional

---

[7] In all, Mr. Widas took the stand three separate times: first during Plaintiffs' direct case, then twice in rebuttal to Mr. Krafchick's testimony. Mr. Krafchick also took the stand

6

calculations (see Ex. P-51; D-19; D-20), but both stood by their original conclusions with regard to the extent of the ladder's capability for deflection.

Thus, the Court acting as factfinder, must decide how much the ladder moved along the x axis.

The Court does not consider the question to be an issue of differing scientific theories or testing methodologies.  Both experts applied lateral force to the ladder, they simply recorded vastly different results.

Nor can the Court reconcile the conflicting testimony through a credibility determination.  Instead, the Court must choose between differing factual testimony of two experts, with no obvious explanation for the differing testimony, and having no engineering expertise to independently assess the experts' explanations for their differing conclusions.[8]  While both

---

three separate times.
    The Court however, denied Plaintiffs' request to allow Mr. Widas to reinspect the ladder for the reasons set forth in the Court's Order of August 9, 2012.

    [8] The practical difficulties that can be created by dueling experts hired by opposing parties have been recognized for more than 100 years.  Learned Hand wrote: "how can the jury judge between two statements each founded upon an experience confessedly foreign in kind to their own?  It is just because they are incompetent for such a task that the expert is necessary at all.  Even where two suppositious propositions are not in direct conflict, the real reconciling grace which may lurk between them is not bestowed, save upon one familiar with the whole line of experience to which they belong; and when the conflict is direct and open, the absurdity of our present system is apparent."  Learned Hand, *Historical and Practical*

7

experts attempted to explain their conclusions with mathematical formulas (see Exhibits P-51, D-19, and D-20), the calculations did not have the desired effect of "assist[ing] the [Court] to . . . determine a fact in issue," Fed. R. Evid. 702.

Nonetheless, quite apart from any special mathematical or scientific knowledge, the Court concludes that Mr. Widas' explanation for the extent of deflection is fundamentally flawed. Mr. Widas' deflection calculation was based upon a single steel side rail and did not account for the fact that the side rail was attached by the ladder rungs to another steel side rail.  Indeed, the defense's expert, Mr. Krafchick, confirmed what any lay person could conclude: two connected steel rails are "much, much stiffer" than a single steel rail. . . . "[s]o if you take into account the entire [ladder] structure, it's quite stiff in . . . the lateral direction."  (Trial Transcript, August 15, 2012, p. 9, 11)[9]

Accordingly, the Court concludes Plaintiff has not established by a preponderance of the evidence that the ladder moved more than three-sixteenths of an inch along the x axis.

---

*Considerations Regarding Expert Testimony*, 15 Harv. L. Rev. 40, 54 (1901-02).

[9] In their Post-Trial Brief, Plaintiffs assert that Dr. Krafchick's testimony as to the extent of deflection is contradicted by "clear evidence of . . . scraping of the end of the anchor bolt on the brick wall shown in photographs [P-]31 and [P-]32." (Plaintiffs' Post-Trial Brief, p. 19)  However, P-31 and P-32 are not in evidence.

**II.**

1. The Federal Tort Claims Act provides in relevant part, "[t]he United states shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674.

2. The Court applies the substantive law of the place where the alleged acts of negligence occurred. *See* 28 U.S.C. § 1346(b)(1); *Richards v. United States*, 369 U.S. 1, 11 (1962). Thus, New Jersey law applies.

3. "In order to sustain a common law cause of action in negligence, a plaintiff must prove four core elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." *Brunson v. Affinity Federal Credit Union*, 199 N.J. 381, 400 (2009) (internal citations and quotations omitted).

In the context of premises liability, landowners owe a duty of reasonable care to business invitees "to guard against dangerous conditions on his or her property that the owner either knows about or should have discovered." *Rowe v. Mazel Thirty, LLC*, 209 N.J. 35, 44 (2012)(quoting *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 434 (1993)); *see also Cleary v. Meyer Bros.*, 114 N.J.L. 120 (E. & A. 1935) (holding that there was no evidence proving that the defendant breached its duty "to exercise ordinary care to render the premises reasonably safe for

the purpose for which [plaintiff] entered.").

4.     Assuming *arguendo* that Defendant breached its duty of reasonable care-- that is, assuming that the ladder was defective insofar as the bottom brackets were completely disengaged from the wall and the ladder was permanently bent to the side-- the Court concludes that Plaintiffs have not sustained their burden of proving proximate cause.

Mr. Summers' own testimony (the only testimony in the record about how the fall actually occurred) is inconsistent with the damage to the ladder.  Mr. Summers testified that the ladder "jarred" or "bounced," "not swung," "from the building" (Trial Transcript, July 31, 2012, p. 116) causing him to fall off the ladder.  This testimony is inconsistent with the ladder's limited potential lateral deflection that resulted from the disengaged brackets and bend in the bottom of the ladder.  The Court cannot reasonably conclude that no movement along the y or the z axis, and only three-sixteenths inches of movement along the x axis could cause Mr. Summers to fall in the manner that he described.[10]

---

[10]  It is not clear whether Mr. Summers was testifying as to movement along the x axis or the z axis.  However, either way his testimony is inconsistent with the other evidence adduced at trial.
    If he meant that the ladder moved along the z axis, that testimony is directly contradicted by both experts who testified that the ladder did not move along the z axis, and by the photographic evidence showing the other three pairs of bolts fully engaged in the wall.
    If he was describing movement along the x axis, as the Court

Thus, the Court concludes that Plaintiffs have not established, by a preponderance of the evidence, the proximate cause element of their claim.

5.  Mrs. Summers' loss of consortium claim necessarily fails as well. *See Sciarrotta v. Global Spectrum,* 194 N.J. 345, 350 n.3 (2008) (noting that the viability of a spouse's derivative *per quod* claim is dependent upon "the survival of plaintiff's claim.").

**IV.**

For the reasons stated above, the Court concludes that Plaintiffs have not sustained their burden of proof as to their claims, and therefore the United States is not liable to them. An appropriate Judgment accompanies this Opinion.

Dated: September 14, 2012      s/ Joseph E. Irenas
                               **JOSEPH E. IRENAS, S.U.S.D.J.**

---

has already explained, such movement cannot be reconciled with the very limited lateral deflection of three-sixteenths of an inch.

11